TOWN OF NEW HARTFORD *vs.* TOWN OF CANAAN.

Where a family is in want they are "poor and unable to support themselves" within the statute, although the father earns enough for their partial support.

It makes no difference that the want is caused by intemperance or improvidence. The law takes no notice of the cause of the poverty, but only of its existence.

Whether a foreigner, coming from another state to a town in this state and being naturalized there, can acquire a settlement in such town in the same manner that a citizen of the United States coming to such town could have done under General Statutes, p. 195, sec. 3: *Quære.*

The statute (Gen. Statutes, p. 60, sec. 5,) provides that no judge or justice of the peace shall be disqualified by interest as a tax-payer in any town that is a party to a proceeding before him. Held that the taking of a deposition before a magistrate who is a tax-payer of the town in behalf of which the deposition is taken, falls within the spirit of this statute and is legal.

[Argued May 14th—decided May 28th, 1884.]

SUIT to recover for supplies furnished paupers; brought to the Court of Common Pleas of Litchfield County, and tried to the court before *Warner, J.* Judgment for the plaintiffs and appeal by the defendants. The case is sufficiently stated in the opinion.

*L. P. Dean* and *W. B. Smith,* for the appellants.

*J. B. Foster* and *A. H. Fenn,* for the appellees.

LOOMIS, J. This is a suit to recover for supplies furnished one LaFayette Parrott and his wife and minor children, alleged paupers of the defendant town.

The first question is, whether under the statute of 1878 (Acts of 1878, p. 317, sec. 8,) the persons referred to, at the time when the assistance was rendered, were "poor and unable to support themselves," and whether the support furnished was "necessary?" The finding of the court, "that at the times when the plaintiff furnished the said aid, medicine and medical attendance for the said Parrott family, they had not sufficient means or credit to obtain them, and that they were necessary and reasonable in amount for their support," would seem to conclude the matter by finding the issue of fact for the plaintiff.

The defendant however claims that there are other facts found which show that the court was led to the above conclusion by an erroneous view of the law. The argument is that the record shows that the family earned during the

time the supplies were being furnished, $1,405.42, and that with such resources they could not be paupers.

If at the time the supplies were furnished they had any such resources it is manifest that they were not paupers. But the statement of fact is misleading. To obtain the sum mentioned the entire earnings of all the members of the family for a period of three years are aggregated. The question before the court was, what the necessities of the family were at the several times during these three years when supplies were furnished. The receipts of the family may not have come in time to meet their necessities as they arose, and if they did, they may have been inadequate for the purpose.

It was shown that the necessities, and consequently the demand for relief, were extraordinary. The finding is that " said LaFayette was very intemperate, frequently quarreled with his wife, and on one occasion during said time destroyed some of the furniture and contents of the house wherein they lived," and that not more than one hundred and eighty-five dollars of his earnings went towards the support of his family during the three years; also that " Theodore Parrott, one of said minor children, was seriously injured in September, 1879, while working in a factory, and soon became entirely helpless and idiotic, and so remained for about eighteen months, and until he died and was buried at the expense of the plaintiff." Upon turning to the bill of particulars it will be seen that it amounts to $244.82, all of which except $32.67 went toward the care and support of this one utterly helpless member of the family. It was the duty of the court to take into consideration all these things, and in view of them it is obvious that we cannot hold as matter of law that the conclusion of the court was erroneous.

There was another suggestion made during the argument in behalf of the defendant which we cannot accept, and that is, that want occasioned by intemperance and improvidence does not create such a necessity as calls for relief from the town. Our laws for the relief of the poor, whether consid-

ered in their letter or their spirit, take no cognizance of the origin and causes of poverty, but only of its existence.

2. As a further defense to this action it was claimed that if the persons referred to were paupers their legal settlement was in the town of Norfolk. This claim was predicated on these facts in the finding:—That LaFayette Parrott was the son of Louis Parrott, who was a native of France, and emigrated to the United States in 1825, and came to reside in Massachusetts; that while living in that state said La-Fayette was born in June, 1836; that said Louis and son came to Norfolk in this state in 1847, and resided there until 1868; that on the 14th day of February, 1855, said Louis was naturalized and became a citizen of the United States while his son LaFayette was a minor. Then follows a further finding giving the details of a purchase by said Louis of real estate situated in Norfolk, of the value of two thousand dollars, subject to the incumbrance of a mortgage which was fully paid and satisfied in 1853, but never released of record, which real estate was occupied by said Louis from September 29th, 1851, until the year 1868. Upon these facts the question arises whether the naturalization of Louis Parrott in 1855, while he and his son were residing in Norfolk, and his subsequent residence or ownership of real estate in that town, made him a settled inhabitant of Norfolk. This depends on the construction to be given to the statutes then in force. Compilation of 1854, pp. 712 and 713, sections 1, 3 and 4. The same statutes, with but little change, are now in force. Gen. Statutes, p. 195. It will be seen that modes of settlement for three different classes of persons are there provided.

First. Foreigners, or those not inhabitants of this state or any other state, territory or district of the United States, who shall come to reside in any town in this state. This class required a vote of the inhabitants or consent of the civil authority and selectmen for their settlement.

Second. Inhabitants of some state, territory or district of the United States other than this state, who may come to reside in any town in this state. Such persons could be

settled only by admission, as provided in the first section, after a year's residence in the town, or by the ownership in fee of real estate of the value of three hundred and thirty-four dollars, free of incumbrance, for the period of one year, the title if by deed being a matter of record during that time.

Third. Inhabitants of some other town in this state. Such could obtain a settlement in one of three ways—by admission, as provided for the first class; by owning and possessing real estate for one year, of the value of one hundred dollars, free of incumbrance; or by six years' residence, without becoming chargeable or neglecting to pay taxes.

These provisions would seem to exclude Louis Parrott from either of these classes. He was not an inhabitant of any other town removing into Norfolk, and therefore not of the third class. He was not an inhabitant of any other state, district or territory of the United States, and therefore not of the second class. When he came to Norfolk he was a foreigner, and, it would seem, belonged to the first class, requiring admission to become an inhabitant, which he did not have.

But what effect had his naturalization, February 14th, 1855, while residing in Norfolk? He was thereby made a citizen of the United States and of this state, with the right to be made an elector under our constitution and laws. But did he thereby become a settled inhabitant of that town? No such result can be attributed to the mere fact of naturalization. The statutes referred to are silent as to naturalization and its effect upon the question of settlement.

It is suggested that after naturalization Louis Parrott cannot belong to the first class. It is true he was no longer a foreigner, and had he afterwards removed to any other town or state he must have been treated and considered as any other citizen. But it should be noticed that in determining the modes of settlement the first and second classes are composed only of "persons who may come to reside in any town in this state," which plainly refers by implica-

tion also to the time when they come into the town to reside. So that the test is as to the first class—was he a foreigner then? and as to the second class—was he an inhabitant of another state then? Although the same expression is not used in reference to the third class, yet that embraces only those who *remove* from one town to another in this state.

In order to give the effect claimed to the act of naturalization we should have to resort to the fiction of considering the person when naturalized as then coming into the town from some other town or state, and also as being an inhabitant of some other town or state, contrary to the fact. · We are free to confess that the fact of naturalization should have been provided for. We can see no good reason why a person naturalized in another state and afterwards removing into this state should become a settled inhabitant as within the second class, when naturalization after his removal would be of no avail.

But the question we are considering is controlled, not by the inherent reason and justice of the matter, but by statute; and we can bring the case within the operation of the statute only by giving it a very liberal construction and extending its effect altogether beyond its terms. In determining whether to give it such a construction we are to consider, on the one hand, that it does not belong to the class of remedial statutes, as to which a liberal construction is proper; and further, that the statute in all its branches is not only positive in its terms, but prohibitory—" no foreigner shall gain a settlement unless, etc."—" no inhabitant of any state or territory, this state excepted, shall gain a settlement unless, etc." On the other hand it is to be considered that it is the policy of the law, and demanded by the spirit of our institutions, that every citizen should acquire an inhabitancy somewhere; that he should become identified with some town as the place in which he is settled, where he has the interests, rights and duties of other inhabitants, and where, in case he comes to want, he will have the right to aid for his comfortable support. It is

also to be considered that, as the case of a foreigner remaining permanently in the town where he has been naturalized is not provided for at all in the terms of the statute, it does not fall within the prohibitory language of the statute. It is wholly a case of omission; manifestly of oversight. If Louis Parrott, after his naturalization, had come from another state to Norfolk, his case would have come within the terms of the statute, and he would at once have begun to acquire a settlement. And so if he had come from any other town in this state. It is a matter of the most absolute indifference to any public interest that he did not so come, and it may not be going too far to hold that this part of the statute, so unimportant when treated as a condition of its operation, may be overlooked, and his case regarded as falling within it, the law treating him as if he had been naturalized in another state and had afterwards removed to this state. As, however, a decision of this question is not necessary to a decision of the present appeal, and as it was not very fully argued before us, we prefer to leave it for the court to deal with at some future time, and upon fuller argument, if it should ever come before it again.

No claim seems to have been made in the court below that La Fayette Parrott gained a settlement in his own right in Norfolk, but certain facts are found which lay a partial foundation for such a claim, and which in the event of another trial may possibly be supplemented by other facts, so as to render the suggestion we are about to make important. La Fayette was born in Massachusetts, in June, 1836, and resided there with his father until 1847, when both removed to Norfolk, in this state, where they resided until 1868. These facts, we think, make La Fayette a citizen of the United States and of the state of Massachusetts by birth. 2 Kent's Com., (7th ed.,) p. 1, note (a). When he went to Norfolk he had the same right as any other inhabitant of another state. Under the decisions in *Bridgeport* v. *Trumbull*, 37 Conn., 484, and *Morris* v. *Plymouth*, 34 id., 270, this right was suspended while he was a member of his father's family during his minority.

But the record shows that he became of age in June, 1857, and resided thereafter in Norfolk until 1868; but the further facts that are essential to bring him under the provisions referred to in the second class are not found.

There was a provision in the compilation of 1854, (p. 721, section 25,) the practical operation of which served in a measure to remedy the defects in the provisions as to settlement to which we have referred. It was there provided that "if any town shall incur any expense in relieving and supporting a person not an inhabitant of this state, who has resided in any town in this state six successive years subsequently to his removal into the state without being chargeable to the state, such expense shall not be reimbursed from the treasury of the state, but shall be defrayed by the town in which he shall have last so resided six years." Under this statute towns were made liable without being the place of the pauper's legal settlement. But this provision was omitted in the Revision of 1875, and in the act of 1878. It also appears that all the expenses in suit were incurred after the year 1878. There are difficulties therefore in applying this provision to the present case, which we regard as insuperable.

3. The next question is, whether the depositions of Harriet Munson and Eunice Johnson were properly rejected, upon the ground that they were taken before a justice of the peace who was at the time a resident and tax-payer of the defendant town. The answer to this question depends upon the construction of the statutes relating to the matter.

It is evident that the ruling of the court was founded upon section 5, page 436, of the General Statutes, which provides that "any deposition written, drawn up, or dictated by the party, his attorney, or any person interested, or that shall be returned to court unsealed, or with the seal broken, shall be rejected by the court." This statute, as appears from the margin, was enacted in 1702. If it is still in force without modification the ruling complained of was correct. But in 1871 another act was passed, now embodied in section five of the General Statutes, page 60, in these

words:—" No judge or justice of the peace shall be dis-
qualified to act in any proceeding by reason of his being a
member of any ecclesiastical corporation, unless it is a party
to the action, nor in any proceeding in which any city,
borough or town is a party, or interested by reason of his
being an inhabitant thereof, or liable to taxation therein,
or by reason of his being related to any tax-payer or
inhabitant thereof."

This language is so exceedingly broad, embracing in
terms any act and any proceeding wherein the justice may
be interested by reason of being an inhabitant and tax-
payer in the town that is a party, that we do not feel at
liberty to accept the ideas of the plaintiff's counsel and
restrict its application exclusively to an actual trial in
court before the interested magistrate; especially as the
reason for any disqualification would apply with much more
force to the judicial proceeding. If a magistrate, owing to
a remote interest as tax-payer, cannot be safely trusted to
perform the ministerial function of taking down in writing
what a witness may say and subscribe to under oath, why
should he be permitted to hear, weigh and construe what
all the witnesses may testify to on the trial, and decide the
whole case both as to fact and law upon its merits? We
think the court erred in rejecting the depositions on this
ground.

4. The remaining question for review relates to the ruling
of the court rejecting as evidence certain probate records
of the probate district of Norfolk, showing the appoint-
ment of a conservator over Chester Johnson in March,
1857, and over his widow, Sarah A. Johnson, in May, 1858;
also, the appointment of an administrator on said Chester
Johnson's estate, in April, 1857, and other proceedings fol-
lowing these appointments. The object of this evidence was
to affect the settlement of said Sarah A. Parrott, through
said Chester Johnson, her former husband, with whom she
lived until his decease in April, 1857, by showing that at
the dates mentioned Johnson was residing in Norfolk.

It would seem unnecessary to enter into any discussion

as to the admissibility and effect of this evidence, for the finding of the court clearly shows that the probate court of the district of Norfolk had no jurisdiction at the time to make the appointments in question. The finding is that "it appeared in evidence that Chester Johnson immediately after his said marriage resided in the state of Massachusetts, and was there taken sick and became insane, and in 1857 came to *North Canaan* in this state, and resided for a short time with his brother there, and from thence was taken to the Insane Retreat at Hartford, Connecticut. While there his relatives on the 5th day of March, 1857, made a written application to the court of probate for the district of Norfolk, (the town of Norfolk being the probate district,) to appoint a conservator over him and his estate, describing him in the application as "Chester Johnson, late of said Norfolk, now at the Insane Retreat at Hartford." There was no error therefore in this respect.

There was error in the ruling of the court rejecting the depositions, and a new trial is ordered.

In this opinion the other judges concurred.